UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PURNIMA SHRIVASTAVA,

       Plaintiff,                  Case No. 15-11520
                                      Hon. Mark A. Goldsmith

vs.

RBS CITIZENS BANK, N.A. and
CITIZENS FINANCIAL GROUP,
INC.,

       Defendants.
_____/

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 30)**

This is an age discrimination case. Plaintiff is Purnima Shrivastava, now a 64-year-old woman, who alleges that she was subjected to "derogatory" remarks at work and that her employment was ultimately terminated by her branch manager, Alaina Keen, because of her age. Shrivastava claims that this conduct violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2201 et seq. Because Shrivastava fails to show a genuine issue of material fact whether Defendants' proffered legitimate, non-discriminatory reasons for their decision were pretexts for discrimination, the Court grants Defendants' motion for summary judgment (Dkt. 30).[1]

---

[1] At the time Shrivastava was hired, she completed and signed an employment application with Defendants, which included a requirement that she bring any "lawsuit against [Defendants] arising out of [her] employment or termination of employment, including but not limited to claims arising under the State or Federal civil rights statutes, . . . within 180 days after the event giving rise to such a claim . . . or be forever barred." Defs. Mot. at 2. Defendants invoke Shrivastava's violation of this purported contractual statute of limitations as an alternative to

## I. BACKGROUND

Defendant RBS Citizens is a bank that operates retail locations ("branches") in Michigan. See Compl. ¶ 6 (Dkt. 1). Defendant Citizens Financial Group is a holding company, and RBS is its wholly owned subsidiary. Id. ¶ 7. Shrivastava began her employment with Defendants in 2002. Id. ¶ 5.

Shrivastava worked as a teller at various branches in Michigan from 2002 until she was involuntarily transferred to the Sterling Heights branch on March 13, 2013. See Defs. Statement of Material Facts ("SMF") ¶ 3; Pl. Resp. at 1-2. It is undisputed that, as a senior teller at the Sterling Heights branch, Shrivastava was expected to provide "quality customer service," including "timely" and "accurate processing of customer transactions"; "maintain[ ] a high level of attention to detail"; and consistently adhere to bank policies and procedures, including those concerning bank fraud and cash handling. See SMF ¶ 6.

Tellers such as Shrivastava also were expected to complete sales referrals, id., which occur when a teller informs a customer about a bank product or service (e.g., a checking account), the teller refers that customer to a personal banker, and the banker sells that product or service to the customer, id. ¶ 8.[2] Bankers also had sales goals, but they were of a different character. See Pl. Resp. at 2 (citing Keen Dep. 91:12-15 (Dkt. 39-4)); see also note 7, infra. Referrals were a "high priority" for the bank, and tellers were expected to achieve 100% of their quarterly referral goals. Id. ¶ 7.

_____

their defense on the merits. See id. at 14. Shrivastava defends by invoking a provision of the application stating that it "does not constitute a contract." See Pl. Resp. at 17 (Dkt. 39). The Court does not reach this issue, however, because Defendants have shown that they are entitled to summary judgment on the merits.

[2] Although Shrivastava disputes the consistency with which a teller is properly credited with a referral, she does not appear to dispute the basic definition of a referral. See Pl. Resp. at 2.

On June 18, 2013, Keen documented her first customer complaint about Shrivastava's "lack of customer service."  Id. ¶ 17.  According to that complaint, Shrivastava had completed the customer's transaction with minimal interaction and failed to respond to the customer's questions after the transaction was completed, and that customer went to another branch to have her questions answered.  See Ex. 1-2 to Keen Decl., Ex. J to Defs. Mot. at 9, 11 (cm/ecf pages) (Dkt. 30-21).[3]

Defendants determined that Shrivastava did not meet her quarterly referral goal for Quarter 2 of 2013 (i.e., April, May, and June of 2013).  See SMF ¶ 18.  They also determined that she did not meet her quarterly referral goal for Quarter 3 of 2013 (i.e., July, August, and September of 2013).  See id. ¶ 20.[4]

---

[3] Included in these facts are Defendants' evidence of customer complaints regarding Shrivastava. Shrivastava's response purports to dispute the fact that Keen received such complaints, but she does not create the "genuine" dispute required to survive a summary judgment motion.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Shrivastava disputes the allegations only insofar as she lacked "direct knowledge" of the customer complaints, as Keen filled out the complaint forms.  See, e.g., Pl. Resp. at 3, 26.  In other words, she disputes the claims because she doesn't know anything about them.  With one exception (i.e., Defendants erroneously attributed three mishandled transactions to three individuals' complaints, rather than attributing three mishandled transactions to two individuals' complaints, see id. at 5), Shrivastava never asserts that the customer complaints did not occur as reported; and, at her deposition, she stated her belief that Keen believed certain complaints about her speed to have been genuine.  See Pl. Dep. at 71:2-9, Ex. 1 to Pl. Resp. (Dkt. 39-1); see also Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly . . . address another party's assertion of fact, . . . the court may consider the fact undisputed for purposes of the motion").  Such an expression of doubt — which does not even constitute a denial, which denial still would be insufficient, see Fed. R. Civ. P. 56(c)(1) — cannot create an issue of fact; defeating a properly supported motion for summary judgment requires some additional evidence.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts"); see also Everson v. Leis, 556 F.3d 484, 496 (6th Cir. 2009) ("[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion").  Finally, at oral argument, Shrivastava's counsel conceded that it was not her position that the complaints did not occur.

[4] This recitation of undisputed facts includes certain instances of Shrivastava failing to meet her "referral goals" for a given period.  In the face of evidence that she failed to meet her referral goals, see, e.g., SMF ¶ 18, Shrivastava's general objection is that "Keen made this representation

In September 2013, the Sterling Heights branch implemented two new sets of operating procedures — the Universal Banker Model ("UBM") and the BIC Teller System ("BIC") — which, respectively, required (i) a transition from multiple tellers handling customer transactions to just one primary teller at a given time; and (ii) a new computer system for processing customer transactions. See SMF ¶ 13. The transition to UBM and BIC required tellers to take on new responsibilities, such as vault and cash management. Id. ¶ 14; Pl. Resp. at 2; Pl. Dep. at 50:18-51:15.[5]

On October 18, 2013, after UBM and BIC were adopted, a customer complained that Shrivastava was taking too long to process the transaction and requested a different teller. See SMF ¶ 21. Around the same time, in October 2013, according to Shrivastava, Keen asked Shrivastava when she planned to retire. See Pl. Dep. at 79:17-81:1. Keen asked Shrivastava a similar question a second time, and Shrivastava believes that this also occurred in 2013. Id.

On December 10, 2013, Shrivastava was placed on a Performance Improvement Plan ("PIP") for failing to achieve 100% of her quarterly referral goals in Quarters 2 and 3 of 2013,

---

to Employee Relations ("ER"), which accepted it without independent verification." Pl. Resp. at 3. As was true of Shrivastava's "disputes" regarding customer complaints, see note 3, supra, this unsupported claim does not suffice as evidence that the failures to meet referral goals did not, in fact, happen. Even if true, ER's practice of accepting Keen's representations does not carry an inference of deception or wrongdoing. This is especially so in light of evidence of Shrivastava's admission that she did not meet certain referral goals. See, e.g., 2013 Mid-Year Performance Review, Ex. 32 to Pl. Resp. (Dkt. 39-32) (stating in self-evaluation that "I missed my [referral] goal").

[5] Defendants' SMF states that the new vault responsibilities were imposed on tellers under the BIC system; Shrivastava's response disputes this, stating that "BIC . . . had nothing to do with vault responsibilities." Pl. Resp. at 2. A review of the record reveals that Defendants' motion simply confused BIC and UBM; according to Shrivastava herself, there were, in fact, new cash handling and vault responsibilities under UBM, notwithstanding Defendants' misstatement regarding BIC.

and for not being on pace to achieve 100% of her Quarter 4 referral goal.  See SMF ¶ 23.[6] According to Sarah Rudisill, who worked in Defendants' ER division, a PIP is the first written warning in Defendants' progressive discipline scheme.  See Rudisill Dep. at 8:16-9:10 (Dkt. 39-7).  The PIP explains that "[o]ver the next 30 days, if you do not demonstrate immediate and sustained improvement or if other deficiencies arise, management will continue the Performance Management Improvement Process, which may result in further corrective action up to and including termination."  PIP, Ex. 18 to Pl. Resp. (Dkt. 39-18).  Following a PIP, the next step is a Final Written Warning, followed, typically, by termination. See Rudisill Dep. at 8:16-9:10.

On December 20, 2013, a customer complained that Shrivastava had tried to credit her $290 deposit as only $265, and that Shrivastava had taken too long to complete the transaction. SMF ¶ 24.

Shrivastava failed to meet 100% of her referral goal for Quarter 4 of 2013.  Id. ¶ 25. Although Keen stated that Shrivastava only achieved 25% of her goal in Quarter 4 of 2013, see Keen Dep. at 134:23-25, another document in the record states that she achieved 57% of her goal in that quarter, see Teller Balance Scorecard, Ex. 20 to Pl. Resp. (Dkt. 39-20).

On January 10, 2014, Shrivastava was given a Final Written Warning ("FWW").  Id. ¶ 26.  The purported reason for the FWW was Shrivastava's alleged failure to meet her referral goals in Quarter 4 of 2013 and not being on pace to achieve 100% of her referral goal for Quarter 1 of 2014.  Id.; see also Pl. Resp. at 4; FWW, Ex. 31 to Pl. Resp. (Dkt. 39-31).  An FWW explains that "[i]f this deficiency continues, or other deficiencies arise at any time during this

---

[6] Shrivastava identifies this paragraph of the SMF as "disputed," but the dispute only takes issue with Defendants' claim that the PIP resulted in Keen coaching Shrivastava on a weekly basis. See SMF ¶ 23.  Shrivastava claims that Keen coaches all her employees regularly.  See Pl. Resp. at 4.

[FWW], you may be immediately discharged or receive additional discipline."  FWW, Ex. 31 to Pl. Resp.

On either January 2 or January 20, 2014, another customer complained about Shrivastava's "poor customer service," citing mistakes Shrivastava made in handling the transaction and requesting that Defendants "get better tellers."  See SMF ¶ 27 (citing Ex. 5 to Keen Decl., at 17 (cm/ecf page)); Pl. Resp. at 4.  On January 21, 2014 and January 24, 2014, two customers complained that Shrivastava deposited their money into the wrong accounts.  See SMF ¶ 28 (citing Exs. 6-7 to Keen Decl., Ex. J to Defs. Mot. at 19, 21 (cm/ecf pages)).

On January 28, 2014, Shrivastava was placed on Final Written Warning Extension status ("FWWE").  See SMF ¶ 30; see also FWWE, Ex. 15 to Pl. Resp. (Dkt. 39-15).  As discussed fully infra, an FWWE supplements an existing FWW without subjecting the employee to further discipline under Defendants' progressive discipline scheme or otherwise increasing the employee's risk of termination.  The FWWE noted Shrivastava's referral-goal shortfalls, as well as customers' complaints regarding her processing errors.  See id. (citing Ex. 15 to Keen Decl., Ex. J to Defs. Mot. at 38-39 (cm/ecf pages)).

On February 7, 2014, while Shrivastava was on FWWE status, two customers complained that Shrivastava had failed to process a total of three night deposits made on January 10, 2014 and January 30, 2014.  See SMF ¶ 32 (three customers complained about three deposits); Pl. Resp. at 5 (clarifying that two, not three, customers had complained about three deposits).  In each case, the deposits were found unprocessed in Shrivastava's "work batch."  See SMF ¶ 32.

On February 10, 2014, a customer complained that Shrivastava had not completed her $500 deposit, which later caused an overdraft fee.  See id. ¶ 33; Ex. 11 to Keen Decl., Ex. J to

Defs. Mot. at 29 (cm/ecf page).  Shrivastava had deposited the money into the wrong customer account.  <u>See</u> SMF ¶ 33 (citing Keen Decl. ¶ 9).

On February 11, 2014, Defendants' regional operations manager informed Keen that Shrivastava had been issued a Policy Not Followed ("PNF") for cashing a counterfeit check that resulted in a $1,683.71 loss to the bank.  <u>See</u> SMF ¶ 34; PNF, Ex. H7 to Defs. Mot (Dkt. 30-14).

On February 18, 2014, a customer complained that Shrivastava incorrectly credited her account with $392, despite having given Shrivastava $400 for deposit.  <u>See</u> SMF ¶ 35.  The customer communicated that Shrivastava frequently makes such errors, requested that Shrivastava not process her transactions in the future, and noted that she was considering closing her accounts with Defendants as a result.  <u>Id.</u>; Ex. 12 to Keen Decl., Ex. J to Defs. Mot. at 31 (cm/ecf page).

On February 25, 2014, a customer complained that he never received credit for a night deposit left in the drop box on February 8, 2014.  <u>See</u> SMF ¶ 36.  The deposit was found unprocessed in Shrivastava's "work batch."  <u>Id.</u>; Ex. 13 to Keen Decl., Ex. J to Defs. Mot. at 33 (cm/ecf page).

Shrivastava alleges that, beginning in roughly late June or early July of 2013, and lasting until January 2014, Keen called her "slow" because Shrivastava's queue of customers got too long, with a frequency of about three times per week.  <u>See</u> Pl. Dep. at 75:17-78:25.  Shrivastava further claims that, contrary to the dictates of UBM, Keen compounded the problem by discouraging Shrivastava's coworkers from helping her with the long queue.  <u>Id.</u> at 76:3-24.  Shrivastava admits that she did not hear Keen discourage the other employees from helping her; rather, it was relayed to her by those employees.  <u>Id.</u>

Although the parties obviously dispute the impetus behind Shrivastava's termination, it is undisputed that Keen recommended Shrivastava for termination on February 19, 2014, see SMF ¶ 41; Pl. Resp. at 6, and Shrivastava was terminated on March 18, 2014. See SMF ¶ 38; Pl. Resp. at 5. Two days after Keen initiated termination, Keen informed the ER department that Shrivastava was on pace to meet her quarterly referral goal for Quarter 1 of 2014. See Rudisill Dep at 98:5-10; see also Termination Case Note, Ex. 23 to Pl. Resp. (Dkt. 39-23).

Shrivastava admits that the only other teller under Keen's management who was ever terminated for failing to meet her quarterly referral goal for three consecutive quarters was 21 years old. See Pl. Resp. at 6; SMF ¶ 46.

## II. STANDARD OF DECISION

On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. DISCUSSION

As an initial matter, "ELCRA claims are analyzed under the same standards as federal ADEA claims." Geiger v. Tower Auto., 579 F.3d 614, 626 (6th Cir. 2009). Accordingly, although the analysis to follow focuses on federal authority applicable to the ADEA, the conclusions reached apply to Shrivastava's claims under either statute.

### A. Direct Evidence of Discrimination

A plaintiff can create a genuine issue of material fact as to age discrimination using either direct or circumstantial evidence of discrimination. Lefevers v. GAF Fiberglass Corp., 667 F.3d

8

721, 723 (6th Cir. 2012). Direct evidence is evidence that is probative of the existence of a fact without requiring any further inferences. See Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548 (6th Cir. 2004). It is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999) (emphasis added). When examining statements allegedly showing employer bias on the basis of age, courts consider whether the comments were made by a decision-maker; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the challenged action. Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1330 (6th Cir. 1994); see also Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1025 (6th Cir. 1993) ("isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination").

Defendants address Keen's alleged tendency to comment on Shrivastava's (i) expected retirement date and (ii) slow pace when processing customers' transactions. See Defs. Mot. at 16. They claim that these statements are "at best 'stray remarks' that do not qualify as direct evidence of discrimination." Id. (citing Phelps, 986 F.2d at 1025). Shrivastava does not respond to Defendants' direct-evidence argument, instead cabining her discussion to the McDonnell-Douglass burden-shifting framework, discussed infra.

Defendants are correct; Shrivastava's claims cannot survive summary judgment on a direct-evidence theory. Several courts, including this one, have addressed decision-makers' comments about a plaintiff's retirement plans, in particular. General questions about retirement directed toward various employees do not compel a conclusion that Shrivastava was terminated because of her age. See Neff v. Petoskey Pub. Sch., No. 236287, 2003 WL 1698215, at *1

9

(Mich. Ct. App. Mar. 27, 2003) (per curiam) ("Merely asking a candidate's age or retirement plans, without more, does not compel the conclusion that age discrimination occurred," particularly when candidate brought up retirement in interview); see also Howley v. Fed. Express Corp., No. 14-cv-11874, 2016 WL 1223356, at *5 (E.D. Mich. Mar. 29, 2016); Stedman v. Cox, Hodgman & Giarmarco, P.C., No. 216008, 2002 WL 234874, at *2 (Mich. Ct. App. Feb. 15, 2002) ("Questions about an employee's retirement plans are not enough to raise an inference of age discrimination.") (citing Woytral v. Text-Tenn Corp., 112 F.3d 243, 247 (6th Cir. 1997)).

The comments regarding the slow speed at which Shrivastava performed her duties also do not rise to the level of direct evidence. Connecting those comments to a conclusion that Shrivastava was terminated due to her age requires a string of inferences, but no inferences between the evidence and the conclusion of age-related animus are permitted in the direct evidence context. See Suits v. The Heil Co., 192 F. App'x 399, 403-404 (6th Cir. 2006); Rowan, 360 F.3d at 548. First, one must draw the inference that slow customer service is caused by advanced age. One also must draw a second inference, i.e., that Shrivastava was terminated due to this animus. See Suits, 192 F. App'x at 403 ("To prevail based on direct evidence, plaintiff must show that the defendant employer acted on its discriminatory animus, not just that it possessed one."). No such inferences are permitted; direct evidence is that which "requires" the conclusion that discrimination was a motivating factor in the decision to terminate. Jacklyn, 176 F.3d at 926; Suits, 192 F. App'x at 403-404 ("Additional inferences are necessary, which compels the conclusion a direct evidence claim has not been established."). In contrast, Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 571-572 (6th Cir. 2003) (en banc), presents an example of when direct evidence is sufficient to survive summary judgment. In that case, the employee's managers were found to be making remarks about his protected age status in

connection with his eligibility for ongoing employment in the same capacity. Id. Here, the comments regarding Shrivastava's slow customer service were not made in a context showing their relationship to Defendants' decision to terminate. Rather, the cause for Shrivastava's termination, insofar as it was based on her slow speed and customer service failings, derived from customers' complaints, not Keen.

At bottom, Shrivastava does not argue that she has produced direct evidence of discrimination. Accordingly, Shrivastava can only survive summary judgment if she can show a genuine issue of material fact as to circumstantial evidence of discrimination.

**B.      Circumstantial Evidence of Discrimination**

Under the circumstantial evidence framework, the plaintiff first has the burden of proving a prima facie case of discrimination; if she is successful, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions; if the defendant articulates a non-discriminatory reason, the plaintiff has the opportunity to prove that the proffered reason is pretextual. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973); Geiger v. Tower Auto., 579 F.3d 614, 622 (6th Cir. 2009) (applying McDonnell Douglas to circumstantial-evidence claims in ADEA and ELCRA cases).

**i.      Prima facie case**

To make out a prima facie case of discrimination, Shrivastava must establish that (i) she is a member of the protected class; (ii) she was qualified for her job and performed it satisfactorily; (iii) she suffered an adverse employment action; and (iv) she was replaced or treated less favorably than a similarly situated person outside her protected class. Laster v. City of Kalamazoo, 746 F.3d 714, 727 (6th Cir. 2014). Defendants do not dispute that termination constitutes "adverse employment action," that Shrivastava — a person in her sixties — was a

member of the protected class, or that Shrivastava was replaced by a similarly situated person outside of her protected class.

Rather, Defendants argue that Shrivastava cannot establish a prima facie case of discrimination because she was not "qualified for her job" and did not "perform it satisfactorily," citing Shrivastava's referral-goal shortfalls and numerous customer complaints. See Defs. Mot. at 18-19. Because of their references to Shrivastava's errors and performance issues, it appears that Defendants cite Webb v. ServiceMaster BSC LLC, 438 F. App'x 451, 453 (6th Cir. 2011), for the proposition that current issues with performance tend to show that an employee is not qualified.

Shrivastava counters by noting the Sixth Circuit's holding that a court "may not consider the employer's alleged non-discriminatory reasons for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the non-discriminatory reason was in actuality a pretext designed to mask discrimination." Pl. Resp. at 20-21 (quoting Hale v. ABF Freight Sys., Inc., 503 F. App'x 323, 333 (6th Cir. 2012)). Instead, "[a]t the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." Id. at 21 (quoting Wexler, 317 F.3d at 570). Shrivastava states that, under Hale, evidence of uninterrupted, uneventful employment at the same position suffices to show that an employee possesses the objective qualifications for the job. Id. (citing Hale, 503 F. App'x at 333).

Shrivastava has the better side of this issue. First, Hale and Wexler squarely hold that the employer's proffered non-discriminatory reason for its decision to terminate the employee cannot operate to rebut the employee's evidence that she was qualified. "[T]he inquiry should

12

focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." Hale, 503 F. App'x at 333 (quoting Wexler, 317 F.3d at 576). The plaintiff in Hale was found "clearly" qualified because he "had nearly 40 years of operations experience in the . . . industry" and "[d]uring the continuous twelve-year period he worked at [defendant employer], his record was relatively clean. He received positive performance reviews all twelve years. It is clear that until the issues . . . surfaced in 2009, Hale was considered a competent, qualified employee." Hale, 503 F. App'x at 333.

Webb does not hold that problems with performance at the time of discrimination preclude a finding of qualification. Rather, it holds that a "stale" performance review, dating from over a year before the employee's discharge, is, without more, insufficient to establish that an employee was otherwise qualified. See Webb, 438 F. App'x at 453. This is a simple recognition that the initial burden to show a prima facie case lies with the plaintiff. The plaintiff in Webb apparently did not argue that the length of his tenure with the employer established that he was qualified, instead putting forth only (i) an old performance review; and (ii) the fact that his colleagues occasionally sought his help with various projects. Id. Webb relied on Strickland v. Federal Express Corp., 45 F. App'x 421, 424 (6th Cir. 2002), which tacked the same way: the employee only put forth old awards and performance reviews, which were rejected by the court because they suffered from staleness.

Although both the Hale plaintiff and the Webb plaintiff cited their positive performance reviews, the difference between them is that the Hale plaintiff also cited the fact that he had been doing the same job, for which he was allegedly "unqualified," for decades. The same holds true of Shrivastava. Moreover, Webb, an unpublished case, relied only upon Strickland, another

13

unpublished case, whereas Hale relied upon Wexler and Geiger v. Tower Automotive, 579 F.3d 614, 624 (6th Cir. 2009), both of which are published.  Geiger held that the plaintiff was "qualified to be MRO Area Buyer for [his employer] because he had already served as MRO Buyer . . . , had 27 years of experience, and had received positive reviews from [the employer]." Id.

These cases instruct that the "qualifications" element of a prima facie case is pertinent to what one normally thinks of as a job's "qualifications," e.g., whether the job requires a certain level of formal education, or a certain number of years in a similar position elsewhere.  See Wexler, 317 F.3d at 576; see also id. at 575 (citing with approval MacDonald v. E. Wyo. Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991) (holding that a plaintiff can show that she is qualified by presenting "credible evidence that she continued to possess the objective qualifications she held when she was hired"), abrogation on other grounds recognized in Hare v. Denver Merch. Mart, Inc., 255 F. App'x 298, 305 (10th Cir. 2007)).  Although a stale performance review, without more, may not suffice to establish that a plaintiff is prima facie qualified, that does not mean, as Defendants would have it, that a defendant may cite its legitimate, non-discriminatory reasons for termination when opposing the plaintiff's prima facie case.  And Defendants' argument focuses exclusively on Shrivastava's lackluster performance and errors that led to Shrivastava's termination — an approach that Wexler and Hale unequivocally proscribe.  Accordingly, this argument is rejected.

Whether or not Shrivastava established a prima facie case of discrimination, however, does not affect the conclusion that summary judgment is appropriate, because, as discussed below, Shrivastava cannot show that Defendants' legitimate non-discriminatory reasons for discharging Shrivastava were mere pretexts for discrimination.

14

### ii.     Legitimate non-discriminatory reason

Assuming that Shrivastava made out a prima facie case of age discrimination, the burden shifts to Defendants "to articulate some legitimate non-discriminatory reason for the employee's rejection." Chappell v. GTE Prod. Corp., 803 F.2d 261, 266 (6th Cir. 1986).   "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."   Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-255 (1981).

Defendants set forth two alternative reasons for terminating Shrivastava: (i) Shrivastava's failure to reliably meet her referral goals; and (ii) Shrivastava's other performance issues, including affirmative violations of policy (e.g., cashing a counterfeit check; failing to process night deposits), as well as behavior giving rise to customer complaints.  See Defs. Mot. at 20.  Defendants' internal "justification for termination" document lists a timeline of referral goal shortfalls and customer complaints, with customer complaints being the last straw leading to termination.  See generally Justification for Termination, Ex. 33 to Pl. Resp. (Dkt. 39-33).

Shrivastava does not contest that these reasons, in isolation, are legitimate and non-discriminatory; instead, she focuses on arguing that these reasons are mere pretexts for discrimination.  See also Whitmer v. Nat'l City Bank, No. 09-12146-BC, 2010 WL 2813495, at *5 (E.D. Mich. July 14, 2010) (bank teller's failure to meet sales goals justified summary judgment to defendants when plaintiff could not establish that this reason for termination was pretext); Holmes v. J.P. Morgan Chase Nat. Corp. Servs., Inc., No. 09-10642, 2010 WL 259051,

at *4 (E.D. Mich. Jan. 20, 2010) (bank employee's violations of bank policy was legitimate, non-discriminatory reason to terminate).   Accordingly, the burden shifts to Shrivastava to show a genuine issue of material fact whether Defendant's proffered reasons for terminating her were mere pretexts for discrimination.

### iii.   Pretext

A plaintiff can establish pretext "by showing that the employer's proffered explanation is unworthy of credence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). "Though [plaintiff] disputes aspects of the contents and context of the performance appraisals, his disagreement with [defendant]'s assessment of his performance . . . does not render [defendant]'s reasons pretextual." Lefevers v. GAF Fiberglass Corp., 667 F.3d 721, 725-726 (6th Cir. 2012).

"When an employer offers more than one independent, legitimate, non-discriminatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the defendant employer is still entitled to summary judgment." Jones v. St. Jude Medical S.C., Inc., 504 F. App'x 473, 477-478 (6th Cir. 2012); see also Sims v. Cleland, 813 F.2d 790 (6th Cir. 1987).   "[W]hen the proffered reasons are independent of each other, 'the falsity or incorrectness of one may not impeach the credibility of the remaining reason(s).'" Jones, 504 F. App'x at 478 (quoting Sims, 813 F.2d at 793).

A "narrow exception" to this rule exists.   In Smith v. Chrysler Corp., 155 F.3d 799, 809 (6th Cir. 1998), the Sixth Circuit stated:

> [A]n employer's strategy of simply tossing out a number of reasons to support its employment action in the hope that one of them will "stick" could easily backfire. "There may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious,

> that the plaintiff could withstand summary judgment." Russell v.
> Acme-Evans Co., 51 F.3d 64, 70 (7th Cir. 1995). Thus a multitude
> of suspicious explanations may itself suggest that the employer's
> investigatory process was so questionable that any application of
> the "honest belief" rule [under which proffered reason cannot be
> pretext for discrimination if it is honestly held] is inappropriate.

Although neither of Defendants' proffered explanations appear facially "fishy and suspicious," the Court believes that this narrow exception applies here. Defendants' progressive discipline scheme generally requires a PIP to issue before a FWW issues. See Rudisill Dep. at 8:16-9:8. Accordingly, the two justifications for terminating Shrivastava are "intertwined"; if there is a genuine issue of material fact whether the initial PIP — which related only to referral-goal shortfalls — was a pretext for discrimination, then the subsequent progression of the disciplinary scheme is suspect, even if Defendants eventually had non-pretextual reasons to advance the progressive discipline scheme further. This Court, therefore, addresses whether Shrivastava rebutted either of Defendants' alleged non-pretextual reasons for her termination.

Pretext can be proven by demonstrating that: (i) the proffered reasons had no basis in fact; (ii) the reasons did not actually motivate the decisions; or (iii) the reasons were insufficient to motivate the actions. Succarde v. Fed. Express Corp., 106 F. App'x 335, 339-340 (6th Cir. 2004). "[The first and third] types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994), overruled in part on other grounds by Geiger v. Tower Auto., 579 F.3d 614 (6th Cir. 2009) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-511 (1993)). "[S]uch a showing permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case." Id. "[E]vidence within the first and third categories is 'easily recognizable.'" Smith v. Hinkle Mfg., Inc., 36 F. App'x 825,

17

829 (6th Cir. 2002) (quoting <u>Manzer</u>, 29 F.3d at 1084).  Because of the similar character of the first and third types of rebuttals, the Court considers them both before examining the second type of rebuttal, i.e., whether Defendants' reasons did not actually motivate their decision.

**a.  Shrivastava Cannot Show that the Reasons for Her Dismissal Had No Basis in Fact**

Regarding her errors and failure to follow Defendants' policies, Shrivastava does not argue that the reasons for her dismissal "had no basis in fact."  Nor does she offer any evidence to that effect.  "To prove that an employer's explanation has 'no basis in fact,' . . . the plaintiff must present evidence that the proffered bases for discharge never happened."  <u>Smith</u>, 36 F. App'x at 829.  To the contrary, Shrivastava readily admitted that (i) she cashed the counterfeit check, <u>see</u> Pl. Dep. 69:14-18; and (ii) customers complained about her performance, <u>id.</u> at 70:11-71:9, 92:21-24.  And regarding those mistakes to which she did not admit outright, she did not meaningfully dispute them either.  <u>See</u> note 3, <u>supra</u>.  This precludes any argument that Defendant's proffered justification for Shrivastava's termination had no basis in fact, at least insofar as the justification was based on her mistakes or customer complaints.  <u>See</u> <u>Hughey v. CVS Caremark Corp.</u>, 629 F. App'x 648, 652 (6th Cir. 2015) (plaintiff's admissions of policy violations precluded argument that his employer's reason for termination was pretextual); <u>see also</u> <u>Smith</u>, 36 F. App'x at 829 ("[T]he Smiths do not deny that several customers complained about Mrs. Smith's performance. The Smiths thus cannot demonstrate that the stated reasons for the discharge were 'unworthy of credence' in the sense that they had no basis in fact.").

The same is true of the referral shortfalls.  With one exception discussed below, Shrivastava does not claim that she completed the requisite amount of referrals, but was fired anyway.  <u>See</u> note 4, <u>supra</u>.  Although she now claims that she was denied opportunities to make more referrals, <u>see</u> Pl. Resp. at 9, this invokes the second method of proving pretext, <u>see</u> <u>infra</u>.

Shrivastava does not dispute Defendants' factual assertion that Shrivastava was placed on PIP status "for failing to achieve 100% of her quarterly referral goal in Quarters 2 and 3 of 2013, and for not being on pace to achieve 100% of her Quarter 4 referral goal," see SMF ¶ 23; Pl. Resp. at 4 (disputing only the portion of SMF ¶ 23 implying that Keen gave Shrivastava additional coaching for these failures).

The one exception noted above is Shrivastava's claim that, in Quarter 2 of 2013, "ten of Purnima's referrals were inexplicably disqualified," see Pl. Resp. at 6, causing her to "ostensibly" fall short of her goal for that quarter, see id. at 24 (citing Coaching Guide, Ex. 17 to Pl. Resp. (Dkt. 39-17)); see also id. at 9. This could amount to a claim that some portion of Defendants' reasons for termination had no basis in fact. But Shrivastava's claim that the disqualifications were "inexplicable" is nothing more than a conclusory and unsupported implication that Defendants' reasons for terminating her were not true. Shrivastava does not even argue that the disqualifications were inappropriate, let alone provide evidence to that effect. Because Defendants' proffered legitimate, non-discriminatory reason is supported by admissible evidence, see, e.g., 2013 Mid-Year Performance Review, Ex. 32 to Pl. Resp. ("I missed my [referral] goal[,] [b]ut I will try this quarter to do that"), Plaintiff has failed to show that this reason was pretextual. See Irvin, 837 F.2d at 726 ("[A] blanket denial that the employer's articulated reasons for properly demoting him were incorrect . . . is not enough; a plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive."); Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992) (in ADEA case, "[w]here the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary

judgment should be granted"); Williams v. Serra Chevrolet Auto., LLC, 4 F. Supp. 3d 865, 876

(E.D. Mich. 2014) (when defendants present evidence of a legitimate, non-discriminatory reason,

plaintiffs "must come forward with evidence" in rebuttal).

> **b.    Shrivastava Cannot Show that the Reasons for Her Dismissal Were Insufficient to Motivate Her Termination**

The third way of showing pretext — that the employer's proffered reasons were

insufficient to motivate Shrivastava's termination — "usually consists of evidence that other

employees, particularly employees not in the protected class, were not fired even though they

engaged in conduct substantially identical to that which the employer contends motivated its

discharge of the plaintiff."  Smith, 36 F. App'x at 829-830 (quoting Manzer, 29 F.3d at 1084)

(internal quotations, brackets, and ellipsis omitted); Hedrick v. W. Reserve Care Sys., 355 F.3d

444, 460 (6th Cir. 2004); Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003).

Shrivastava cannot show this as to the referral goals, having admitted that that the only

other teller under Keen's management who was ever terminated for failing to meet her quarterly

referral goal for three consecutive quarters was 21 years old.  See Pl. Resp. at 6; SMF ¶ 46.[7]

---

[7] Shrivastava's response notes that, in the same quarter during which Defendants issued a PIP to Shrivastava for failing to meet her referral goals, "Keen gave Siddique 'a low sales goal' because she was also getting acclimated to her new position in the universal bank."  Pl. Resp. at 12-13. This is not sufficient to show pretext under the third method, as Siddique (i) was also in the protected class, being 54 years old, see Siddique Dep. at 4:23-25; see also 29 U.S.C. § 631(a) (limiting ADEA protections to individuals 40 years old and older); and, more importantly, (ii) was not similarly situated to Shrivastava, as Siddique was a banker, and, as such, she had different quarterly goals, both in character and scope, Pl. Resp. at 2 (citing Keen Dep. 91:12-15 (agreeing that bankers did not have "referral goals" but had, e.g., "unit goals, dollar goals, loan volume goals")); Azeez Dep. at 82:18-83:1 (Dkt. 32-6) (describing bankers' quarterly goals as "bigger" than tellers').  See Rutherford v. Britthaven, Inc., 452 F. App'x 667, 672 (6th Cir. 2011) (employees with different titles and responsibilities not "similarly situated" for third method of showing pretext).

Regarding the mistakes and other issues with customer service, Shrivastava alleges that "Keen singled out [Shrivastava] again and again while she turned a blind eye to younger counterparts."  Pl. Resp. at 23; id. at 7 (citing Pl. Dep. at 71:5-7).  According to Shrivastava, Keen "gave employees a grace period to acclimate to BIC, but documented a customer complaint concerning [Shrivastava] during this grace period."  Id. (citing 10/18/2013 customer complaint, Ex. 14a to Pl. Resp. at 2 (cm/ecf page) (Dkt. 39-14)); see also Azeez Dep. at 60:12-17, Ex. 6 to Pl. Resp. (Dkt. 39-6) ("Q.  [A]fter you converted to the BIC teller system, if there were mistakes, would [Keen] write up the mistakes? . . . A.  No, because, I mean, we all knew it was new."). The only example of a younger coworker committing a mistake during the grace period appears in Shrivastava's deposition, wherein she describes a specific situation in which Keen chastised her for putting money into the wrong customer's account, but when a banker in the branch — Lara Azeez, who was in her mid-30's, see Pl. Resp. at 7 — made the same error, Keen laughed it off.  See Pl. Dep. at 97:18-99:13.  This occurred in 2013, shortly after Defendants implemented the BIC and UBM systems.  See id. at 99:14-100:3.

There are a few problems with Shrivastava's proffered example of her and Azeez being treated differently.  First, the "grace period" complaint, which Shrivastava claims would not have been documented as to younger workers, related to a customer's dissatisfaction with her wait time at the drive-through window.  See Pl. Resp. at 23 (citing Ex. 14a).  It had nothing to do with depositing money into the wrong account, so the incident with Azeez does not provide an example of a younger worker being treated differently for similar conduct.  Even if the October 2013 complaint concerned the type of conduct that Shrivastava described, Shrivastava provides no evidence that she was disciplined for her error and Azeez was not.  Her description of the treatment that she and Azeez received is nothing more than a subjective comparison of Keen's

attitude toward her and Azeez, and she admits that she did not know whether Azeez was later disciplined for her mistake.  See Pl. Dep. at 100:14-101:10.  A single example of a disparity in how Keen informally reacted to Shrivastava's and Azeez's similar conduct does not suffice to show that Azeez was "not fired even though [she] engaged in conduct substantially identical" to Shrivastava's, Smith, 36 F. App'x at 829-830 — especially when Defendants contend that this motivation for terminating Shrivastava was the aggregation of her conduct, which spanned several months; prompted many customer complaints; and, in the case of the counterfeit check, caused a four-figure loss to the bank that, unlike Azeez's error, could not be remedied.  See Justification for Termination, Ex. 33 to Pl. Resp. (identifying referral-goal shortfalls and customer complaints); Keen Dep. at 192:10-21 (listing "all the issues that were happening with Purnima, be it referrals, PNFs[,] [and] customer complaints" as the basis for termination). Furthermore, Defendants' internal "justification for termination" document (Dkt. 39-33) does not indicate that the decision to terminate Shrivastava was based on any events that occurred in 2013.  Nor do the PIP, PNF, FWW, or FWWE reference the October 18, 2013 complaint.

Shrivastava also claims that Keen now considers Shrivastava's mistakes as "major," see Keen Dep. at 129:17-130:18, but she did not characterize them as "significant" on the customer complaint forms.  See Pl. Resp. at 26.  However, Keen's deposition testimony explained that the "significant" designator on the complaint form is reserved for when a customer threatens to contact the media or an attorney.  See Defs. Reply at 14-15; Keen Dep. at 145:24-146:4.  Keen thus established that a "significant complaint" was something of a term of art within Defendants' organization, and her later statement that Shrivastava's mistakes were "major" is not necessarily inconsistent with declining to label the complaints "significant."  By ignoring Keen's explanation for the precise meaning of a "significant" complaint, versus a "major" complaint,

Shrivastava's argument amounts to little more than a blanket denial of the substance of Keen's testimony on this point. When it is not supported by evidence, such a denial does not create a genuine issue of material fact as to whether Defendants' reasons for terminating Shrivastava were pretextual. See Irvin v. Airco Carbide, 837 F.2d 724, 726 (6th Cir. 1987).

Shrivastava next claims that "if Purnima's performance was actually deficient, Keen would not have hesitated to [i] document those deficiencies in her August 2013 performance review, or [ii] [bring] those deficiencies to [the] attention of her new regional manager in November 2013. Instead, Keen did neither." Pl. Resp. at 24-25; see also id. at 12 (noting Keen's November 2013 visit by regional manager Susan Smigiel).

The August 2013 mid-year performance review, however, is not inconsistent with Defendants' current position. First, Keen's signature on the review is dated August 3, 2013. Of at least 12 complaints at issue in this case, only one occurred before that date. Although Keen's review of Shrivastava is generally positive, the review does not affirmatively claim that Shrivastava's performance was incident-free. See 2013 Mid-Year Performance Review, Ex. 32 to Pl. Resp. ("The transfer to [the Sterling Heights Branch] was tough on her at first but she is becoming more adjusted each day."). And the performance review does note Shrivastava's failure to meet her referral goals, albeit in Shrivastava's own words. Id. If Defendants had claimed that one customer complaint, combined with a failure to meet referral goals for a single quarter, was sufficient to terminate Shrivastava, then the 2013 mid-year performance review would undermine that claim. But this performance review does not rebut Defendants' proffered non-discriminatory reasons, which pertain to myriad events that ramped up later in 2013 and continued into 2014.

Nor does the testimony of Susan M. Smigiel, the regional manager for the region including the Sterling Heights branch, rebut Defendants' proffered reasons for terminating Shrivastava.  Smigiel stated that Keen did not "flag" Shrivastava as "somebody who was having problems at the branch."  See Smigiel Dep. at 42:19-23, Ex. 3 to Pl. Resp. (Dkt. 39-3).  But nothing in Smigiel's deposition supports Shrivastava's conclusion that Keen "would not have hesitated" to tell Smigiel about Shrivastava's performance during that visit.  Smigiel testified that she had absolutely no role when a branch manager decides that an employee should receive a PIP, id. at 47:23-49:5, so Keen would have no real reason to identify an individual employee during a meeting with Smigiel.  Furthermore, Smigiel testified that, even if the employee in question was eventually terminated, she would "not necessarily" recall the very conversation that Shrivastava claims did not occur, due to the high number of employees in her region.  Id. at 46:4-9.

Shrivastava notes that, after Keen got permission from ER to terminate her, ten days passed before she was actually terminated.  See Pl. Resp. at 26.  Shrivastava argues that, if she really was such a liability, such a delay would not have occurred.  Id. (citing Keen Dep. at 182:1-24 (Keen "can't . . . fight to keep [her] doors open" when faced with "mistake, after mistake, after mistake"); 194:12-14 (Keen believed Shrivastava was costing her business)).   However, Shrivastava's own statement of facts concedes that a week of that period was attributable to Keen's scheduled vacation, id. at 14; see also Keen Dep. at 199:4-11, and Keen testified that Shrivastava was not scheduled to be at work for "the next few days" leading up to her vacation, see Keen Dep. at 199:4-16.   It would thus have been impossible for Keen to effectuate Shrivastava's termination, in person, without either calling Shrivastava into the office on Shrivastava's day off or canceling her own vacation.  Because the record provides an explanation

24

for the delay, Shrivastava's mere mention of the delay does not create an issue of material fact as to whether Shrivastava's conduct was insufficient to justify termination.

Finally, Shrivastava contests Rudisill's claim that cashing a counterfeit check would have, without more, warranted her termination.  See Pl. Resp. at 27 (citing Rudisill Decl., Ex. 29 to Pl. Mot, at 3 (Dkt. 39-29)).  Shrivastava claims that, in fact, bank policy requires progressive discipline, beginning with coaching.  Id.  Shrivastava's argument, however, conveniently ignores Rudisill's ultimate conclusion: that Shrivastava's "receipt of a PNF for cashing a counterfeit check while on FWWE warranted termination."  See Rudisill Decl. at 3 (emphasis added).  Even absent Rudisill's context and conclusion, Shrivastava's argument about the declaration would still be a straw man.  Defendants' motion, like Rudisill's testimony, frames the counterfeit check not as the sole basis for termination, but in the context of all of the other alleged reasons for terminating Shrivastava.  See Defs. Mot. at 10. Whether Shrivastava is correct that a counterfeit check could not, without more, justify termination under bank policy is of no moment.

### c.   Shrivastava Cannot Show That the Reasons for Her Dismissal Did Not Actually Motivate the Decision

The final way to create a genuine issue of material fact as to pretext is to show a dispute whether the employer's proffered reasons "did not actually motivate the discharge decision." Russell v. Univ. of Toledo, 537 F.3d 596, 604 (6th Cir. 2008).  Whereas the first and third methods "are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff," this second method

> is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing

circumstances which tend to prove that an illegal motivation was
<u>more</u> likely than that offered by the defendant. In other words, the
plaintiff argues that the sheer weight of the circumstantial evidence
of discrimination makes it "more likely than not" that the
employer's explanation is a pretext, or coverup.

<u>Manzer</u>, 29 F.3d at 1084 (emphases in original). To establish pretext under the second method, a

plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly

believe' in the proffered non-discriminatory reason for its adverse employment action." <u>Jones</u>,

504 F. App'x at 477 (quoting <u>Braithwaite v. Timken Co.</u>, 258 F.3d 488, 494 (6th Cir. 2001)).

Shrivastava's first claim is that "Keen's age-related questions and discriminatory remarks

are probative evidence of pretext." Pl. Resp. at 23. Indeed, "[w]hile discriminatory remarks can

constitute direct evidence, they also serve as probative evidence of pretext." <u>Bartlett v. Gates</u>,

421 F. App'x 485, 491 (6th Cir. 2010). Because age-related remarks simply "tend to add 'color'

to the employer's decisionmaking processes and to the influences behind the actions taken with

respect to the individual plaintiff," <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344,

356 (6th Cir. 1998), such remarks properly are analyzed under the second method of showing

pretext. However, for the same reasons discussed <u>supra</u> vis-à-vis direct evidence of

discrimination (i.e., that the comments were "isolated and ambiguous"), Keen's alleged

comments do not suffice to show pretext. <u>See</u>  <u>Phelps v. Yale Security, Inc.</u>, 986 F.2d 1020,

1025-1026 (6th Cir. 1993), <u>cert. denied</u>, 510 U.S. 861 (1993) (applying "isolated and

ambiguous" inquiry to age-related comments in a case where plaintiff only alleged circumstantial

evidence of discrimination under ADEA). Accordingly, by reference to these comments,

Shrivastava cannot show a genuine issue of material fact whether Defendants' "legitimate, non-

discriminatory" motives for terminating Shrivastava "did not actually motivate the decisions."

Shrivastava also claims that her alleged slowness should have been mitigated, because the UBM and/or BIC systems had a procedure under which she should have been assisted by other employees when she became overwhelmed at her teller's window — a procedure that she claims Keen stymied by discouraging other employees from helping her.  See Pl. Resp. at 10, 23 (citing Azeez Dep. at 83:5-8, 83:20-25; Pl. Dep. at 83:18-24; 76:23-24).   However, citing Shrivastava's allegation that she heard of Keen's discouragements through her coworkers, see Pl. Dep. at 84:22-23, Defendants made the unrebutted claim that such evidence is inadmissible hearsay and cannot be considered in a pretext analysis.  See Defs. Mot. at 18; see also Back v. Nestle USA, Inc., 694 F.3d 571, 579 (6th Cir. 2012) (plaintiff limited to admissible evidence when showing issue of material fact as to pretext).  What remains of this argument, in the form of admissible evidence, is not sufficient to survive summary judgment:  Azeez, who Keen allegedly discouraged from helping Shrivastava, stated that Keen "didn't say not to help"; rather, Azeez stated that, when bankers had customers in the branch, Keen instructed bankers that, "our [i.e., bankers'] customers come[ ] first."  Azeez Dep. at 82:7-15 (emphasis added).  Azeez further stated that helping Shrivastava would "affect" the bankers because a banker's referral goal "was bigger, . . . so we had our own work to do," id. at 82:18-83:1, and that bankers' own goals should be their "priority," id. at 83:20-25.  The admissible evidence does not support Shrivastava's assertion that Keen explicitly discouraged other employees from helping Shrivastava simply to make Shrivastava fail.  To the extent that any discouragement occurred, the evidence shows that it was done when, and because, bankers were otherwise occupied with something that Keen deemed a better use of a banker's time.

Shrivastava also claims that, once she was issued her PIP on December 10, 2013 due to her referral shortfalls, Keen began staggering her documentation of complaints for maximum

27

effect.  See Pl. Resp. at 25 ("keeping some of them in her back pocket in order to generate more corrective action").  Specifically, Keen documented complaints against Shrivastava on December 18, 2013, and January 2, 2014, yet she did not include them as a basis for Shrivastava's FWW, which issued on January 10, 2014.  Id.[8]  Keen allegedly unleashed these pre-FWW complaints in order to generate the FWWE on January 30, 2014.  See Pl. Resp. at 25.  Shrivastava further alleges that Keen identified the January 2, 2014 complaint as having occurred on January 20, 2014, in order to conceal this fact.  Id. at 25-26.

These charges do not withstand scrutiny.  Most importantly, Shrivastava does not explain how things would be different if all complaints were referenced on the initial FWW.  Rudisill stated that, "typically," the next step after issuance of an FWW was termination, not an FWWE.  See Rudisill Dep. at  9:4-10.  Likewise, the "Justification for Termination" report notes that an FWW initially issued "for goals not met," but that an FWWE issued later "to include customer complaints."  See Justification for Termination, Ex. 33 to Pl. Resp. (emphasis added); see also Keen Decl. at 6 (FWWE provides "additional opportunity to rectify . . . performance deficiencies").  An FWWE, therefore, appears to be little more than an "amended" FWW; an FWWE was not a necessary waypoint on the road to terminating an employee, see also Keen Decl. at 5 (noting that 21-year-old employee terminated for referral-goal shortfalls was not offered an FWWE), and it does not bring the employee any closer to termination in the progressive disciplinary scheme.[9]

---

[8] Sarah Rudisill, who worked in Defendants' ER department, confirmed that the failure of an incident to appear on an FWW could be attributed to the branch manager (i.e., Keen).  See Rudisill Dep. at 45:14-24 (Dkt. 39-7).

[9] Moreover, regarding Shrivastava's charge that the January 2, 2014 complaint was altered to appear to post-date the initial FWW, this fails to explain the FWWE's clear reference to the December 18, 2013 complaint.  See FWWE, Ex. 15 to Pl. Resp. (Dkt. 39-15) (noting customer complaint "received on 12/2013").  If Keen really sought to conceal the inclusion of pre-FWW

Shrivastava also fails to rebut Defendants' proffered legitimate, non-discriminatory reason for terminating her based on her referral-goal shortfalls.

Shrivastava claims that the timing of certain of Keen's actions impugns Defendants' proffered reasons for her termination:

> Keen also arbitrarily decided to put Purnima on probation two days after she returned from a 3-week protected absence. . . . Although Q2 [Quarter 2 of 2013] ended on June 30, and Q4 [sic; Quarter 3 of 2013] ended on September 30, Keen waited for six weeks to implement corrective action for these so-called deficiencies. Keen's decision to implement probation six weeks after the fact, once Purnima returned from medical leave, was retaliatory and hostile, and most certainly designed to push her out of the bank.

Pl. Resp. at 24 (citing Bell v. Prefix, Inc., 321 F. App'x 423, 431 (6th Cir. 2009) ("suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence")). Crucially, however, Shrivastava does not explain why this timing was suspicious. She briefly labels the timing as evidence of Keen's "retaliatory" motive — but in retaliation for what? In Bell, the timing was deemed suspicious because it was the medical leave itself that the plaintiff claimed as the reason for his unlawful termination. See Bell, 321 F. App'x at 430. There, the implication was obvious when the plaintiff took medical leave and was fired almost immediately thereafter. Here, Shrivastava alleges age-related animus, and neither the delay in issuing the PIP nor the PIP's temporal proximity to her return from a protected absence is relevant to that animus.

Shrivastava also claims that "Keen credited younger employees with referrals for walk-in customers, even though she claimed it was bank policy not to award referral credit for walk-ins." Pl. Resp. at 9 (citing Keen Dep. at 41:14-21; Azeez Dep. at 24:1-6). However, Shrivastava never

---

complaints in the FWWE, she would have needed to lie about the date of the December 18 complaint, too.

alleges that she would have met her referral goals — or even made a single additional referral — if she had received credit for walk-ins.[10]  Additionally, Shrivastava has not provided any evidence that Keen credited any younger employees with referrals for walk-ins; Shrivastava cites page 24 of Azeez's testimony, presumably to prove this point.  See id. (citing Azeez Dep. at 24:1-6).  However, although excerpts of Azeez's deposition were attached to all three filings on this motion, see Ex. G to Def. Mot. (Dkt. 30-7); Ex. 6 to Pl. Mot. (Dkt. 39-6); Ex. G to Defs. Reply (Dkt. 41-7), none of them includes the page that Shrivastava cited on this point, so the Court could not consider it.

Shrivastava argues that Defendants' legitimate, non-discriminatory reason cannot be believed because "Defendants keep shifting their rationale for termination."  Pl. Resp. at 26. Shrivastava claims that the internal "justification for termination" document relied upon "five complaints that allegedly occurred between January 10 and February 18 [2014]."  Id.  Ignoring the fact that the "justification for termination" accounted for the role of Shrivastava's referral-goal shortfalls in Defendants' progressive discipline scheme, Shrivastava states, "Keen now adds to her reasons that Purnima was deficient in her sales, [even though] the record plainly

---

[10] In any case, Shrivastava mischaracterizes Keen's relevant testimony.  Keen did not testify that she awarded referral credit for walk-ins, in violation of company policy.  Keen agreed with Plaintiff's counsel's example of a "walk-in" for which referral credit should not be awarded: e.g., a customer who simply "walks in, goes to the teller, and says, 'I want to open an account.'" See Keen Dep. at 41:3-16.  There is no evidence that this kind of walk-in generated a referral credit for a younger employee.  By contrast, Keen awarded extra referrals to an employee whose flyer brought a high-value customer into the bank.  Id. at 41:24-42:13; see also id. 44:4-12 (tellers got referral credit when their flyer resulted in a sale).  That employee "got her one single referral," plus two extra referrals due to the customer's high value.  Id. at 41:24-42:13.  Indeed, Shrivastava's own argument about being denied the opportunity to go flyering, see infra, is premised upon the availability of referral credit for customers who walk into the branch because of flyering.  And, to the extent Shrivastava objects to the Keen's discretionary award of two extra referrals to the employee who brought in a high-value client, such an award does not violate a prohibition on referral credit for walk-ins.

establishes she was actually 'on pace for her goals performance." Id. at 26-27 (citing Termination Case Note, Ex. 23 to Pl. Resp.).

The Sixth Circuit has held that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext. . . . Shifting justifications over time calls the credibility of those justifications into question." Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir. 2002). In Cicero, the defendant employer had purchased the employee plaintiff's previous employer. Id. at 583. From the time of the takeover until the plaintiff was discharged, the new employer "continued to praise [plaintiff]'s work and award him performance-based bonuses." Id. at 592. When the plaintiff was fired, he was told it was because the new employer wanted to install its own personnel ("a Borg-Warner team") in the plaintiff's division. Id. at 592. However, "[i]n answering interrogatories, [defendant] for the first time said that it fired [plaintiff] because of poor performance." Id. And during summary judgment proceedings, the defendant walked back its original justification for terminating plaintiff, admitting "that it did not fire the entire management team, [but] only those members of the team who dealt directly with the company's headquarters." Id.

The instant case is not on par with what happened in Cicero. There, (i) the reason for termination provided to the plaintiff was not the same as the reason offered during litigation; (ii) the defendant offered reasons for termination that were flatly contradicted by the record; and (iii) the defendant later admitted that the reason it provided to the plaintiff was not entirely accurate. Shrivastava, by contrast, has a lengthy record of referral shortfalls, mistakes, and customer complaints, all of which have been more or less consistently maintained by Defendants throughout both Shrivastava's disciplinary proceedings and this litigation. Although it identifies the February 2014 customer complaints as the final straw, the "justification for termination"

document references both rationales for termination, stating that the FWWE was created "to include customer complaints" within the original FWW, which addressed referral goals.  <u>See</u> Justification for Termination, Ex. 33 to Pl. Resp.  Furthermore, the "justification for termination" document was "never intended to be a comprehensive listing of . . . performance deficiencies, nor is it intended to be reflective of every customer complaint lodged" against an employee.  <u>See</u> Rudisill Decl. at 2, Ex. 29 to Pl. Resp.  And, finally, there is no evidence that, on the date that Keen recommended Shrivastava for termination (February 18, 2014), she was aware of Shrivastava being "on pace" for her quarterly goal.  No document deemed Shrivastava "on pace" prior to February 21, 2014.  <u>See</u> Rudisill Dep. at 98:5-10; Termination Case Note, Ex. 23 to Pl. Resp.  Shrivastava, therefore, has not shown that Keen's February 18, 2014 recommendation for termination was disingenuous under <u>Cicero</u>.  <u>See also</u> <u>Thurman v. Yellow Freight Sys., Inc.</u>, 90 F.3d 1160, 1167 (6th Cir.), <u>opinion amended on denial of reh'g</u>, 97 F.3d 833 (6th Cir. 1996) (evidence of pretext present when employer changed factual position as litigation continued; and employer's claims of performance issues belied by evidence of satisfactory performance and employer's failure to note performance issues at time of adverse action).[11]

Finally, Shrivastava claims that Keen did not permit her to "flyer."  <u>See</u> Pl. Resp. at 9.  "Flyering" entailed going out into the community surrounding the branch and advertising the bank's services, which could lead to a referral for the employee whose efforts brought in a customer.  <u>See</u> <u>id.</u>; <u>see also</u> Azeez Dep. at 77:13-22.  Shrivastava's own deposition is silent on her own flyering efforts and/or intentions, as she failed to mention flyering at any point —

---

[11] The fact that Defendants' motion notes some complaints that were received post-termination, <u>see</u> SMF ¶ 45, does not impeach the legitimacy of their proffered reasons for termination.  The post-termination complaints were not considered during Plaintiff's termination; they were of a same general character as the complaints that did play a role in Plaintiff's termination, as opposed to the shifting rationales in <u>Cicero</u> and <u>Thurman</u>; and, in any event, they were not considered by this Court.

including when asked to list all instances of discrimination that she suffered.  <u>See generally</u> Pl.

Dep.; <u>see also</u> <u>id.</u> at 88:2-6.

Keen's deposition testimony is Shrivastava's only evidence in support of her claim that

Shrivastava was not permitted to flyer.  <u>See</u> Pl. Resp. at 9.  Keen did agree that she did not ask

Shrivastava to distribute flyers at the time that Shrivastava was failing to meet her referral goals

— but only because Shrivastava "was [the branch's] only teller" at that time.  <u>See</u> Keen Dep. at

44:17-24; <u>see also</u> <u>id.</u> at 45:23 ("No, because she was my only teller at that point.").  Keen

acknowledged that when she had multiple tellers working during the same shift — during the

summer of 2012 — she did encourage flyering, but this was before the spring/summer of 2013

when Shrivastava began working at Keen's branch.  <u>See</u> <u>id.</u> at 45:3-12, 21-23; 233:16-20.  And

Keen stated that Shrivastava was never denied the opportunity to go flyering.  <u>Id.</u> at 236:6-9 ("Q.

And again, you have no specific recollection as to any specific instances when plaintiff was

denied the opportunity to go flyering? A. No, she would not have been denied.").

Rather than attack the legitimacy or sufficiency of Keen's proffered non-discriminatory

motives for these decisions, Shrivastava attempts to impeach Keen by arguing that Keen's stated

motives were inconsistent and, therefore, pretextual, stating only:  "Keen <u>first</u> said it was because

Purnima 'was my only teller . . . .  I needed her at my branch.'  <u>Later</u>, Keen said Purnima 'wasn't

there at the time.'"  Pl. Resp. at 9 (emphases added).  However, these two rationales are perfectly

reconcilable.  Even viewed in a light most favorable to Shrivastava, these statements are not

contradictory:  According to Keen's testimony, Shrivastava was not present when the multi-teller

team was in place — i.e., the time when flyering was appropriate — and she was present when

there were not multiple tellers — i.e., the time when flyering would not have been appropriate.

Even if Shrivastava could offer evidence that Keen never let her go flyering at the same time she permitted younger tellers to go flyering, it is undisputed that other members of the protected class — i.e., Siddique, who was about 51 years old, and Ogina Disho, who was in her late 40s or early 50s — were permitted to go flyering at some point.  See Siddique Dep. at 4:23-25 (Siddique was 54 years old as of March 2016); Keen Dep. at 58:10-11, 232:14-25 (Disho was 52 years old as of February 2016; listing employees who flyered, including Siddique and Disho). This fact "critically diminishes" Shrivastava's claim that flyering opportunities were denied on the basis of age-related animus.  See Wilson v. Ford Motor Co., 513 F. App'x 585, 591 (6th Cir. 2013) (noting, in affirming a grant of summary judgment, that the African-American plaintiff had "no response to the reality that [defendant] prequalified six African-Americans who were elected and promoted as team leaders, an undisputed fact that critically diminishes her pretext claim"); see also Barnes v. GenCorp Inc., 896 F.2d 1457, 1466 & n.13 (6th Cir. 1990) (fact that retained employees are also in protected class does not necessarily defeat ADEA claim, but the closer they are in age to the plaintiff, the less plausible the claim is); Abdulnour v. Campbell Soup Supply Co., 502 F.3d 496, 504 (6th Cir. 2007) ("As the Supreme Court [has] noted . . . , summary judgment is appropriate, as in this case, if the plaintiff 'only created a weak issue of fact as to whether the defendant's reason was untrue' and there is ample evidence to support the employer's position.") (quoting Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 148 (2000)).

At bottom, it was Shrivastava's burden to put forth evidence to establish a genuine issue of material fact surrounding the flyering issue — the resolution of which could show that "the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action."  Jones, 504 F. App'x at 477 (quoting Braithwaite v. Timken Co., 258 F.3d

488, 494 (6th Cir. 2001)).   By failing to meaningfully address Keen's explanation for why Shrivastava was not able to go flyering, Shrivastava has not created a fact issue as to whether she could prove pretext by a preponderance of the evidence at trial.

### C.   Hostile Work Environment

To state a hostile work environment claim under the ADEA and ELCRA, a plaintiff must establish four elements: (i) the employee was 40 years old or older; (ii) the employee was subjected to harassment, either through words or actions, based on age; (iii) the harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment; and (iv) there exists some basis for liability on the part of the employer.   Hale, 503 F. App'x at 337 (ADEA); Betts v. Costco Wholesale Corp., 558 F.3d 461, 468 (6th Cir. 2009) (ELCRA).

Defendants focus on the "unreasonable interference" prong. See Defs. Mot. at 23-24.   In determining whether this prong is satisfied, courts consider the totality of the circumstances, including the severity of the alleged conduct, its frequency, whether it was physically threatening or humiliating or merely offensive and whether it unreasonably interfered with the plaintiff's performance.   Thorton v. Fed. Express Corp., 530 F.3d 451, 455 (6th Cir. 2008).   "Whether harassment is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a question of fact.'"   Crawford v. Medina Gen. Hosp., 96 F.3d 830, 835-836 (6th Cir. 1996) (quoting Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1130-1131 (4th Cir. 1995)).   To survive summary judgment, however, the Sixth Circuit requires a plaintiff to assert more than the "false syllogism" of "A) My coworkers hate me; B) I am old; C) My coworkers hate me because I'm old."   Id. at 836.

Much of Shrivastava's response relies on her subjective reactions to working under Keen. See Pl. Resp. at 30-31 (noting Shrivastava's decision to seek out her former branch's manager, her high blood pressure, and coworkers' perceptions that she appeared stressed out).  While a hostile-work-environment plaintiff cannot proceed unless she subjectively perceives an abusive environment, see Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993), the ultimate standard is whether the abuse is "severe or pervasive enough to create an <u>objectively</u> hostile or abusive work environment — an environment that a <u>reasonable person</u> would find hostile or abusive," see id. at 21 (emphases added); <u>Crawford</u>, 96 F.3d at 835 ("the appropriate viewpoint for determining the severity or pervasiveness is an objective one"); <u>see also</u> <u>Molitor v. Henry Ford Health Sys.</u>, No. 11-15556, 2013 WL 5435049, at *8 (E.D. Mich. Sept. 30, 2013) (plaintiff's cardiomyopathy insufficient survive summary judgment on hostile work environment claim).

That leaves the following allegations:

> Keen routinely chastised Purnima for being slow, and in the same breath would ask when she would retire. Keen reprimanded Purnima for the same thing she would turn a blind eye to for younger employees. Keen also provided younger co-workers increased opportunities to promote their sales, and blatantly undercut Purnima's ability to succeed at her job by telling other employees not to assist her at the teller counter.

Pl. Resp. at 30.

First, to consider Keen's comments about Shrivastava being "slow" would employ the same "false syllogism" proscribed by <u>Crawford</u>.  There is nothing about being called slow that implies age-related animus.  <u>See</u> <u>Waltherr-Willard v. Mariemont City Sch.</u>, 601 F. App'x 385, 388 (6th Cir. 2015) (insults that "do not mention [a plaintiff's] age . . . do not show that any hostility occurred because of her age").  Shrivastava's attempt to connect these comments to Keen's questions about retirement ("and in the same breath would ask when she would retire")

finds no support in the record.  And twice being asked about one's retirement plans — which Shrivastava conceded she thought was "a casual thing," <u>see</u> Pl. Dep. at 80:17-23 — is legally insufficient to support a hostile work environment claim.   <u>See</u> <u>Crawford</u>, 96 F.3d at 836 (deeming "two comments that are <u>objectively</u> indicative of age-based animus" — i.e., "women over 55 should [not] be working" and "old people should be seen and not heard" — insufficient to survive summary judgment on hostile work environment claim (emphasis added)).   Keen's alleged comments instructing coworkers not to help Shrivastava are inadmissible hearsay and, in any case, are simply not of a character that would contribute to a workplace "permeated with discriminatory intimidation, ridicule, and insult," <u>Harris</u> 510 U.S. at 21.  And, finally, the claims that Keen provided increased sales opportunities to younger coworkers likewise cannot support a hostile work environment claim, because, discriminatory or not, by their nature they do not invoke the kind of acute intimidation, ridicule, abuse, or insult contemplated by a hostile work environment claim.  <u>See</u> <u>id.</u>

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 30) is granted, and the case is dismissed with prejudice.  A separate judgment will enter.

SO ORDERED.

Dated:  January 5, 2017                    s/Mark A. Goldsmith
Detroit, Michigan                          MARK A. GOLDSMITH
                                           United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 5, 2017.

                                           s/Karri Sandusky
                                           Case Manager

37